JEAN-PAUL CIARDULLO, CA Bar No. 284170
    jciardullo@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE:   213.486.0065

JONATHAN E. MOSKIN (pro hac vice)
    jmoskin@foley.com
JMOSKIN@FOLEY.COM
**FOLEY & LARDNER LLP**
90 PARK AVENUE
NEW YORK, NY 10016-1314
TELEPHONE:     (212) 682-7474
FACSIMILE:     (212) 687-2329

Attorneys Defendant-Counterclaimant
KAYAK SOFTWARE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| EVOX PRODUCTIONS LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> KAYAK SOFTWARE CORPORATION, a Delaware corporation; and DOES 1-10, <br><br> Defendants. <br> _____ <br> KAYAK SOFTWARE CORPORATION, a Delaware corporation, <br><br> Counter-Claimant, <br><br> vs. <br><br> EVOX PRODUCTIONS LLC, a Delaware limited liability company, <br><br> Counter-Defendant. | Case No. CV15-05053-PSG-AGR <br><br> **KAYAK SOFTWARE CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF JEFFREY SEDLIK** <br><br> Date:     January 23, 2017 <br> Time:     2:30 p.m. <br> Place:     Courtroom 6A |

4839-3838-0604.1

TO THE HONORABLE COURT, ALL PARTIES, AND ALL ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 2:30 pm on January 23, 2017, in Courtroom 6A of the above-entitled Court, located at 350 W. 1st Street, Los Angeles, California 90012, Kayak Software Corporation ("Kayak") will, and hereby does, move the Court *in limine* for an order excluding the testimony of Jeffrey Sedlik.

Mr. Sedlik's testimony exceeds the scope of his claimed expertise and much of his report is irrelevant. Much of it is also not proper rebuttal. Mr. Sedlik's testimony, therefore, be excluded.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 9, 2016.

DATED: December 16, 2016     **FOLEY & LARDNER LLP**


By: /s/ Jonathan E. Moskin
    Jonathan E. Moskin
    Jean-Paul Ciardullo

Attorneys for Defendant/Counterclaimant
KAYAK, INC.

# <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ....................................................................... 1

II.    ARGUMENT ............................................................................... 2

    A.    DAUBERT STANDARDS ................................................. 2

    B.    MR. SEDLIK'S CONTRACT ANALYSIS IS IRRELEVANT
        AND MISLEADING ........................................................ 3

        i.    Mr. Sedlik's Report Is Not Proper Rebuttal ................................... 10

    C.    MR. SEDLIK'S ANALYSIS OF COPYRIGHTABILITY IS
        IRRELEVANT ................................................................ 11

        i.    Mr. Sedlik's Report Is Not Proper Rebuttal ................................... 15

III.    CONCLUSION ........................................................................... 16

4839-3838-0604.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   2013 U.S. Dist. LEXIS 160188 (N.D. Cal. Nov. 6, 2013) ............................ 3

*Bikram's Yoga Coll. of India, LP v. Evolation Yoga, LLC*,
   803 F.3d 1032 (9th Cir. 2015) ................................................................... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ........................................................................... 2, 3, 9

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................... 2

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
   528 F.3d 1258 (10th Cir. 2008), *cert denied*, 555 U.S. 1138 (2009) .............. 12, 14, 15

*Peters v. West*,
   692 F.3d 629 (7th Cir. 2012), explained ...................................................... 12

*Satava v. Lowry*,
   323 F.3d 805 (9th Cir. 2003) ..................................................................... 15

*Stop Staring! Designs v. Tatyana, LLC*,
   2012 U.S. Dist. LEXIS 192949 (C.D. Cal. Feb. 21, 2012) ........................... 3

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002) ....................................................................... 3

**Statutes**

17 U.S.C. § 102(b) ........................................................................................ 12

**Other Authorities**

Fed. R. Evid. 403 ............................................................................................ 2

Fed. R. Evid. 702 ..................................................................................... 2, 9

# I.   __INTRODUCTION__

The basis of this litigation is a license agreement under which KAYAK obtained from Evox generic stock photos of automobiles (equally available from several other stock photo houses) to use as thumbnails accompanying search results on its car rental search business that is part of its popular travel service.  Despite the small cost of the license totaling roughly $11,000 for an entire year (including all of the disputed uses on KAYAK's mobile app), Evox now seeks a windfall of $100 million in damages based on a theory that KAYAK's use of the photos on its mobile app exceeded the scope of the license and thus constituted copyright infringement.

Evox has submitted a report of a claimed expert in stock photography, Jeffrey Sedlik, to rebut the report of KAYAK's expert, Gary Elsner.  Mr. Sedlik's report has two broad sections, one concerning contractual terms of the license agreement and the other concerning the copyrightability of the subject photographs.   As shown below, Mr. Sedlik's report should be excluded because he is not a lawyer competent to opine on the terms of the parties' Agreement and has no personal knowledge what the parties intended.  Indeed, without even attempting to consider the Agreement in any coherent manner or in context, he argues both that the principal disputed term, "portal," has no meaning in the contract, yet also offers some evidence purporting to show that the term does have some accepted meaning in the industry (albeit not for licensing).   This evidence is also contrary to the testimony of Evox's own designated witness on contract issues that the term was simply created and used subjectively by Evox.   At any rate, Mr. Sedlik's report is accompanied by no evidence that the term is actually used for licensing in the industry – such as sample agreements from other entities – and he nowhere says that it is.  His report is inadmissible to challenge the sworn testimony of Evox's own witnesses and is not of any probative value in challenging the report of Mr. Elsner that the term in fact is not used in the industry.  His other analysis of contract terms is equally irrelevant and he is not competent to try to divine the subjective mental

state of KAYAK's own employees who negotiated the Agreement, notwithstanding his insistence he knows better than they do what they themselves understood.

Regarding copyrightability of the subject photographs, Mr. Sedlik's report is inadmissible because he makes no effort to analyze the content of any of the photographs actually in issue, none of which are even mentioned. To the contrary, his entire analysis was simply copied verbatim from a report Mr. Sedlik prepared several months earlier for another case for Evox involving entirely different photographs. He admitted at his deposition he does not even remember what photographs were at issue in that case. Moreover, his report only describes broad processes for photographing automobiles, referring to no actual expression in any of the Evox photographs at issue, yet as Evox itself admits, it is only expression in the photographs that could possibly be copyrightable, not the processes used to create the images.

## II.   <u>ARGUMENT</u>

### A.   Daubert Standards

A party seeking to introduce expert testimony generally has the burden of demonstrating that the expert is qualified, based on the witness' "knowledge, skill, experience, training, or education," and that (1) the testimony is "based upon sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993). The court acts as a "gatekeeper" to ensure that expert testimony satisfies the admissibility requirements of Rule 702 and is "not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

In addition to the requirements of Rule 702, a court must independently weigh the probative value of the testimony against unfair prejudice, confusion of the issues, misleading the jury, and/or waste of time. Fed. R. Evid. 403. While methodological deficiencies often go to the weight rather than the admissibility of a consumer survey, if the flaws are sufficiently serious, "Rule 403 permits the exclusion of relevant evidence 'if

its probable value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."  *Daubert*, 509 U.S. at 595.

### B. Mr. Sedlik's Contract Analysis Is Irrelevant and Misleading

Mr. Sedlik is not a lawyer and has identified no qualifications that would permit him to opine on the meaning of the parties' Agreement.  Indeed, he admits in his report (p. 14) (Ex. 1 to Moskin Dec.):  "I am not an attorney and do not provide a legal interpretation of the Agreement terms."  Lacking such qualifications, he cannot testify on issues of contract interpretation.  *White v. Ford Motor Co.,* 312 F.3d 998, 1008-09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."); *Apple, Inc. v. Samsung Elecs. Co*., 2013 U.S. Dist. LEXIS 160188, *42 (N.D. Cal. Nov. 6, 2013) ("Under Federal Rule of Evidence 702, experts may not make expert conclusions about areas outside their expertise."); *Stop Staring! Designs v. Tatyana, LLC*, 2012 U.S. Dist. LEXIS 192949, *2 (C.D. Cal. Feb. 21, 2012) (vacating jury verdict and granting new trial where expert had been allowed to testify outside his expertise).  Although an expert in stock photo licensing could potentially testify to how certain terms are actually used in actual licensing agreements in the field, Mr. Sedlik offers no such analysis in his report.

Despite his admitted lack of qualifications (or perhaps because of that lack), Mr. Sedlik plainly misreads even the literal language of many contract terms and gratuitously faults KAYAK based on his misunderstanding of KAYAK's legal position.

Mr. Sedlik lists many terms of the Agreement that he says (p. 18) demonstrate that KAYAK "repeatedly acknowledged that the [subject] Photographs are copyrightable, protected by copyright and owned and licensed by Evox."  In fact, the Agreement is conspicuously silent about any such acknowledgement by KAYAK.  Missing from the Agreement[1] are any words or provisions (which are common to intellectual property

---

[1]The Agreement was designated "Confidential" by Evox and was filed under seal as ECF No. 60-4 (ex parte), Ex. 1) to Kayak's pending motion for summary judgment.

licenses, as Mr. Sedlik acknowledged he has seen (Ex. 4 to Moskin Decl. Sedlik Tr. 106 l. 2-9)), expressly stating that KAYAK acknowledges that Evox's claimed rights in its intellectual property are valid much less any undertaking by the licensee not to challenge the validity of the claimed rights.  Instead, KAYAK merely agrees not to claim title to the "Licensed Materials."  (Appendix ¶ 9.)  It has no interest in doing so.

To reach his conclusions, which are not supported by any legal analysis or citation of any rules of contract construction, Mr. Sedlik first badly misconstrues the language of the "recitals" in the Agreement.  In fact, Evox's form contract recites only that "Whereas Evox creates and owns *libraries* of images …" and KAYAK merely acknowledges that "Licensee wishes to license certain content from Evox…"  There is no mention of copyright, yet Mr. Sedlik's report says (p. 18) that in the recitals, Kayak somehow "acknowledged that Evox is the copyright owner and licensor in the Photographs." Likewise, the actual language of the license grant (¶ 4) refers only to "products," namely the "AIL" or "Automotive Image Library" that was the subject of the Agreement.  There is no mention of copyright and no acknowledgement by KAYAK that it acquiesced in any such (non-existent) claim of copyright ownership.  Mr. Sedlik mistakenly goes on to cite KAYAK's undertaking to include with the photos Evox's standard form copyright notice (p. 19), ignoring that the parties expressly agreed that no such notice was required by KAYAK.  Instead, the Agreement (¶ 10.1) provided for so-called page attribution, under which KAYAK needed only to state on the bottom of each page of its website displaying Evox photos that "Vehicle images are licensed from Evox."[2]  (Even if KAYAK had agreed to provide a notice to third parties that Evox claimed copyright in the images, that would be very different from itself admitting the validity of the copyrights.)  Mr. Sedlik's argumentative and mistaken rewriting of the Agreement can only confuse jurors and should not be allowed.

---

[2]Had the parties not agreed to use "page attribution," the form copyright notice would have included a statement about what Evox claimed to be its copyright (Appendix ¶ 6), and would have done so only as a notice to third parties.  It included no admission or acknowledgement by KAYAK that the claimed rights are valid or enforceable.

KAYAK'S MTN TO EXCLUDE SEDLIK TESTIMONY
-4-
Case No. CV15-05053-PSG-AGR

Although it makes no difference to KAYAK whether the images are protected by copyright (because they merely serve an incidental background function of illustrating cars alongside KAYAK's actual service of providing information to users about rental rates and locations so they can make bookings), Mr. Sedlik insisted he knew better than KAYAK itself that it needed and wanted only copyrighted images.  For no apparent reason, he refused to credit the possibility that KAYAK just wanted convenient access to a reasonably large library of consistent images (with the cars facing in one direction), as actually testified to by the employees who negotiated the deal, insisting instead by some a priori assumptions that the contract terms had to be interpreted to mean KAYAK conceded the validity of the copyrights.  By the same reasoning, he also insisted that everyone who goes to public libraries wants to know if the books are copyright-protected. (Sedlik Tr. 131:7-140:17.)  Untethered from fact or logic and unsupported by any rules of contract interpretation, such testimony by a non-lawyer can only mislead the jury.

Again unsupported by any legal analysis or citation of any rules of contract construction, Mr. Sedlik purports to construe the term "portal website," which is used in the Agreement drafted by Evox to define the scope of use to mean simply a website. (P. 16.)[3]  Mr. Sedlik agreed in his deposition that his "definition" of "portal" deprives the word of any meaning, such that the scope of use of "portal website" should be read to mean only "website website."  (Sedlik Tr. 98:22-102:24)  Notwithstanding his contention that "portal" has no meaning, he nonetheless immediately contradicts himself by offering in his report (p. 21) a definition that does ascribe meaning to "portal" (as "a website considered as an entry point to other websites or online content").  Laying aside that KAYAK considers its website to be a portal or entry point to its full range of travel services, including its completely integrated mobile app, and laying aside that Mr. Sedlik

---

[3]Paragraph 6 of the Agreement defines the scope of use as a "research application on a single Portal Website."  It is KAYAK's position that a "portal" must be a portal or opening to something, in this case to KAYAK's actual business, all of which is fully integrated with its website.  Otherwise, Evox could have simply said "website" and included express exclusions of KAYAK's mobile app, which it did not do.

never addresses this interpretation of the term "portal," his definition is taken from his own dictionary for the stock photo industry, but nothing in the dictionary definition says the term has any accepted meaning in licensing, much less in defining the scope of a license.  Not surprisingly, Mr. Sedlik identifies in his report not a single example of any such license in which the term is used, much less any supporting his and Evox's view. (As shown below, although Mr. Sedlik's report is offered as a rebuttal to KAYAK's expert on stock photography, Gary Elsner, who opines that the term "portal" is not a standard term in licensing stock photos, Mr. Sedlik's inability to offer any contrary evidence supports KAYAK's contention.)

In offering his definition for "portal," Mr. Sedlik also does not address or attempt to reconcile his views with the actual sworn testimony of Evox's designated witness on the subject of contract interpretation, Barry Thompson, or Evox's founder, David Falstrup, admitting that Evox itself does not know how Evox came to use this term in its contracts.  (SUF[4] 30-31.)  Contrary to Mr. Sedlik's interpretation, Evox itself thus agreed that "portal" is not used by it as an industry standard term.  To the contrary, it uses the term primarily to distinguish subscription-type licenses from so-called Dealer Value Added Reseller ("DVAR") licenses.  (SUF 32.)  Mr. Sedlik instead indicates he knows better than Evox's own 30(b)(6) designated witness what the contract term means. (Sedlik Tr. 147: 5-149:8.)  In offering these plainly inconsistent statements, Mr. Sedlik cites no guiding principles of contract interpretation.

As noted, Mr. Sedlik does not cite in his report a single other industry contract in which the term "portal" or "portal website" appears.  Nor does he cite a single example in which the term is used in any manner remotely similar to that here where any company such as KAYAK has a website that is thoroughly integrated with its mobile app.  That Mr. Sedlik's dictionary definition does not expressly mention mobile apps is not surprising because it was first crafted (evidently with the assistance of KAYAK's expert,

---

[4]Reference is to KAYAK's Statement of Undisputed Fact accompanying its motion for summary judgment.  (ECF No. 60-2 (ex parte).)

Mr. Elsner) and has not been updated since 2006 (Sedlik Tr. 206:5-9), but the first mobile apps did not appear until 2008, after the launch of the iPhone.

Mr. Sedlik also made no effort to analyze numerous Evox agreements in which it routinely uses the identical definition of "portal" in contracts it uses to license use of its images for mobile apps.  (SUF 46.)  None are cited in the list of documents reviewed in Exhibit B to his report and the language of these agreements is nowhere mentioned in his report.  Instead he simply surmised (p. 24) that in those instances the licensee specifically requests the right to make use on a mobile app.  Despite these many omissions, including the failure even to mention any guiding principles of contract interpretation, and despite the fact that Mr. Sedlik is not even a lawyer, he asserts without reservation that KAYAK "cannot reasonably claim that the definition of 'portal" was vague, ambiguous, or subject to interpretation."  (p. 16.)  Indeed, as shown below, Mr. Sedlik insists that he knows better than KAYAK itself what KAYAK understood was the scope of the license when it entered the Agreement (and, as noted, also believes he knows even better than Evox what Evox meant by the term "portal").

The only actual industry "contracts" Mr. Sedlik cites in his report (pp. 25-27) do not use the term "portal" or "portal website."  Instead, they are simply internet pages with drop-down menus in which licensees can pick from options for use,  including use as website or for mobile apps or both (among other possible uses).  Certainly Evox never presented KAYAK with a similar range of choices before the parties signed their Agreement.  Hence, Mr. Sedlik's own examples, divorced from the actual circumstances of KAYAK's actual travel services business and the actual Agreement here at issue, disprove his own suggestion that the term "portal" should have somehow clearly signaled to KAYAK it would not be permitted to use the subject images on its mobile app.

Mr. Sedlik purports to have reviewed various documents (Ex. B to Report), including KAYAK's Counterclaim, the deposition of Lauren Fulton, who negotiated the contract with Evox on behalf of KAYAK, and the Report of Gary Elsner, KAYAK's stock photography expert, which set forth KAYAK constant and unshaken understanding

that the Agreement permitted use of the subject stock photos on its mobile app; that KAYAK never would have entered any Agreement that would have required it to disable or partly disable a key part of its business (*i.e.*, the mobile app) when essentially the same generic photographs were available from other stock photo companies; that KAYAK in fact paid for all such uses on its mobile app because that was what it understood the contract contemplated, and that the tiny cost of the contract (even including payment for all uses on the mobile app) could not possibly justify trying to save a few dollars by evading any known limitations of the Agreement on its highly popular and very public mobile app.  Despite his knowledge of KAYAK's statement of its own understanding and KAYAK's explanation why it held (and still holds) its understanding of the meaning of the Agreement, Mr. Sedlik's report conspicuously never even mentions much less seeks to address these known facts or reconcile his conclusions with the reality of what KAYAK has said and what it did (in actually paying for all of the disputed uses).  He does not have to agree with KAYAK's position, but if he does not even acknowledge it, his contrary conclusions are meaningless.

So absurd is Mr. Sedlik's position that, at his deposition, he refused even to concede that, at the very least, KAYAK (even if only subjectively) knows better than does he what KAYAK itself understood, what KAYAK itself intended and what KAYAK itself actually did in paying for its very public use of the subject photos.  (Sedlik Tr. 150:14-162:25.)   In trying to explain why he never addressed in his report why KAYAK would ever have entered such a tiny contract for photos it could have gotten elsewhere without disabling or partly disabling its mobile app, Mr. Sedlik later denied that that was the meaning of his testimony but he never admitted that KAYAK itself clearly knows better than he does what it intended and continued to refuse to entertain even the possibility that the parties simply misunderstood one another; instead, he suggested either that KAYAK was trying to defraud Evox or that its employee who negotiated the deal was incompetent.  (Tr. 170:14-189:19.)  The fact that he failed even to attempt to address these issues, and his refusal to admit the obvious that KAYAK of

course knows better than he does what it subjectively understood, deprive Mr. Sedlik's report of any tissue of credibility.  Stated in an admittedly extreme manner (as noted during Mr. Sedlik's deposition), the only way Mr. Sedlik's testimony could be allowed under FRE 702 were if he could claim expertise in mind-reading.  Mr. Sedlik's nonsensical insistence that he knows better than even KAYAK what it subjectively understood, and his insistence on some a priori interpretation of the contract divorced from any known rules of contract construction, makes his views inadmissible under *Daubert*.

Further demonstrating his bias, Mr. Sedlik states in his discussion of the factual background (p. 9) that "Kayak informed Evox that is was only interested in using the Licensed Photographs on KAYAK.com."   In fact, there is no record of any such communication in this case, and there is no citation to any such record in Mr. Sedlik's report.[5]  His bias is also made manifest by statements such as the following false and argumentative assertion in the factual background of his report: "Kayak cannot reasonably claim that after engaging in an intensive negotiations process, reviewing and revising agreement terms, …. It did not understand terms such as 'website' and 'URL' as used within the Agreement …"   Not only is it not for Mr. Sedlik to opine on what KAYAK can reasonably claim, but it is pure fiction to say that there were intensive negotiations for an contract that cost an entire $11,000 for an entire year, and there is not even a dispute in the case what terms such as "website" and "URL" mean.  His bias is also shown by his refusal to answer even the simplest questions at his deposition, such as whether he had any factual basis to challenge KAYAK's *contention* in this case that it paid for all uses of the photos on its mobile app as well as its website.  (Tr. 49-62.)

---

[5]The closest thing to such a statement is a question posed by Evox in perhaps the very first message it sent to KAYAK inquiring if KAYAK wished to use the images on its website.  But KAYAK never answered the question directly and certainly never said affirmatively that it was only interested in using the images on its website.  (SUF 19.)  Mr. Sedlik's statement is simply false.  Mr. Sedlik need not agree with KAYAK's understanding, but to testify at all, much less as an expert, he must be able to articulate why.  His bare *ipse dixit* conclusions are meaningless.

Mr. Sedlik's report is simply baseless argument by a non-attorney unqualified to construe a contract and can only confuse the jury.

### i.    Mr. Sedlik's Report Is Not Proper Rebuttal

Although offered as a rebuttal to the report of KAYAK's stock photography expert, Gary Elsner, who did not attempt to construe the meaning of the Agreement but instead only explained that the term "portal" or "portal website" is not a standard term used in licensing and explained the nature of the subscription pricing model set forth in the Agreement, Mr. Sedlik does not actually respond to or directly address what Mr. Elsner states.

As noted, consistent with Mr. Elsner's report, Mr. Sedlik does not identify a single other stock photo license that uses the term "portal" or "portal website." Moreover, Mr. Sedlik likewise does not directly dispute the opinion of KAYAK's expert that the licensing model used in the Evox/KAYAK Agreement was a subscription pricing model in which KAYAK had essentially limitless use of all the images for an essentially fixed price,[6] thus treating the photos essentially as commodities. Mr. Sedlik does not address the subscription pricing model at all or express any direct disagreement with Mr. Elsner, but instead references yet another pricing model (pp. 12-13.), namely, a "rights managed" model, which he says is the proper way to categorize the Agreement. However, in discussing the "rights managed" model, he never disagrees with Mr. Elsner's conclusion that the Agreement here is best viewed as a subscription model. He merely mentions the "subscription" model but does not explain why he thinks it is or is not applicable or whether he disagrees with Mr. Elsner. Moreover and more important, semantics aside, because the jury here will not be asked to decide what label to apply to the Agreement, what matters is that Mr. Sedlik *never even addresses* the only *substantive* conclusion from Mr. Elsner's report: namely, that the Agreement licensed an entire catalog of images for a modest monthly fee that is, in effect, a form of commodity pricing. (SUF

---

[6]In the Agreement, the specific pricing was $950/month for the first two million unique visits and $250 for each additional million visits.

KAYAK'S MTN TO EXCLUDE SEDLIK TESTIMONY
-10-      Case No. CV15-05053-PSG-AGR

40, 162.)  The only reason this is relevant is that given the commodity pricing, there was no reason for Evox to object to KAYAK's use of the images on its mobile app, because that simply would have generated more revenue (which it of course received anyway because that is the deal KAYAK thought it was entering).  Indeed, Evox's own witness who negotiated the Agreement concedes he would have been happy to include the mobile app had he realized that was what KAYAK intended all along.  (SUF 17.)  Nonetheless, at his deposition, Mr. Sedlik refused even to acknowledge the possibility that KAYAK understood it was licensing the right to use the images for its actual business, not just a part of the business.

Mr. Sedlik further devotes two pages of his report (p. 22-23) to arguing that a mobile app is distinguishable from a website.  However, this is not rebuttal, as neither KAYAK nor its expert, Mr. Elsner, ever argued that the two are the same.  Moreover, Evox already designated a separate claimed expert, Brad Ulrich, to testify on this issue (or non-issue) as part of its affirmative case (not in rebuttal).

Allowing Mr. Sedlik to testify on contract issues can only serve to confuse the jury.  For the same reason, his report should be inadmissible in opposing KAYAK's pending motion for summary judgment.

## C.    Mr. Sedlik's Analysis of Copyrightability Is Irrelevant

Mr. Sedlik is not a lawyer and identifies in his report no expertise to allow him to testify as an expert on this subject of copyright law.  His report also is not proper rebuttal to Mr. Elsner's report, in which Mr. Elsner simply (i) reviewed the five photographs identified by Evox as containing some original expression in response to two Court orders (ECF No. 32 and 43) directing it to identify all of the allegedly copyrightable elements in its works in response to KAYAK's Interrogatory 2; (ii) reviewed some of the thousands of similar photographs available from other sources; (iii) reviewed the deposition testimony of Evox's witnesses on what if anything was original in the subject photographs, and (iv) concluded he could identify nothing original that distinguished the Evox photographs from the multitude that preceded them.  Indeed, Mr. Sedlik nowhere

mentions the five photographs or indeed any of the Evox photographs in issue; never considers any of the prior art; never considers the admissions by Evox's witnesses that Evox did not originate the features it now says are original, and never identifies anything original and non-functional (*i.e.*, copyrightable) in any of the subject photographs.

It is well-settled (and Mr. Sedlik does not question) that copyright does not protect processes; only the actual expression in individual works might be (assuming it is original and non-functional). *See* 17 U.S.C. § 102(b) ("[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, … regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Bikram's Yoga Coll. of India, LP v. Evolation Yoga, LLC*, 803 F.3d 1032, 1043 (9th Cir. 2015). *Peters v. West*, 692 F.3d 629 (7th Cir. 2012), explained, in language directly relevant to photographic processes such as those at issue here:

> Copyright protects actual expression, not methods of expression. 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 104 (1879). Just as a photographer cannot claim copyright in the use of a particular aperture and exposure setting on a given lens, no poet can claim copyright protection in the form of a sonnet or a limerick. Similarly, [plaintiff] cannot claim copyright over a tercet. See *Steele v. Turner Broad. Sys. Inc.*, 646 F. Supp. 2d 185, 192 (D. Mass. 2009) ("A common rhyme scheme or structure does not qualify as original expression protectable under federal copyright law.").

*Id.* at 636. *Accord*, *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1268 (10th Cir. 2008), *cert denied*, 555 U.S. 1138 (2009).

Mr. Sedlik's report begins (p. 28) by noting correctly that Evox need not employ novel techniques for its photographs to be copyrightable, but rather that (whatever its techniques) "[i]t is the resulting  expression, not the technique used to achieve that expression, that determines eligibility for copyright protection." However, once correctly establishing this one element of the test of copyrightability, he never provides any

analysis of the expression in any of the photographs at issue and never responds to anything Mr. Elsner observed about his (Mr. Elsner's) inability to identify in the Evox photographs any original or nonfunctional expression.

Not only does Mr. Sedlik's report identify no creative expression in any of the actual Evox photographs at issue in this case, he nowhere identifies in his report any of the specific Evox photos (if any) that he purports even to have reviewed and he nowhere mentions any expression in any such photographs that might support a finding of copyrightability. Likewise, he does not even attempt to weigh whether those elements are original or nonfunctional. Nor does he address any of the thousands of third-party photographs that are virtually indistinguishable from the subject Evox photos. He does not address Evox's answer to KAYAK's Interrogatory No. 2, in which Evox listed all of the allegedly copyrightable elements of its photographs or attempt to reconcile his testimony with that interrogatory answer. Nor does he mention any of the deposition testimony of Evox's witnesses admitting that most or all of these elements were either adapted from prior third-party photographs of cars, are functional or are not features for which Evox has retained any records to prove how they were done or why.

The most obvious reason for the complete irrelevance of Mr. Sedlik's discussion of copyrightability is that his entire analysis (Sections J – X p. 28-40) was copied verbatim from a report he prepared for Evox in a prior case that did not involve any of the photographs at issue here, namely *Evox Productions LLC v. California Rent-A-Car*. (Moskin Dec. Exs. 2, 3.) Mr. Sedlik admitted at his deposition he did not even remember what photographs were at issue in the *California Rent-A-Car* litigation. (Tr. 33:24-34:15.) When confronted by the fact that his "analysis" was simply copied from a case involving entirely different photographs, the most Mr. Sedlik could say was that Evox's techniques were the same. (Tr. 237:15-238:14.) Laying aside that that is not true because the *California Rent-A-Car* photographs did not involve the same "spin" process (and Mr. Sedlik certainly never attempted to show they did), as Mr. Sedlik admits, as a matter of law, "techniques" and "processes" are not copyrightable, only expression.

Demonstrating his lack of candor, Mr. Sedlik (before being confronted with the fact that his report was simply copied from another case), testified under oath that where he used the term photograph with a capital "P" he (generally) meant to refer to the photographs actually at issue.   (Sedlik Tr. 216:23-217:5.)   In fact, excluding his introduction (§I) the word  "Photograph(s)" is capitalized only 5 places in the analysis sections the report, Sections J – X (p. 31 §K; p. 32 §L; p. 40 §V, 43 §X.[7])  However, the falsity of this testimony is shown by the fact that he used the same capitalization pattern in the report he prepared for Evox's litigation against California Rent-A-Car (Moskin Decl. Ex. 2:  p. 5 ¶ 6; p. 6 ¶ 18; p. 6 ¶1 9; p. 15 ¶ 44 and p. 16 ¶45), involving entirely different photos.  The only partially new section he added was his legal analysis of the *Meshwerks* decision (§W.)  And even in discussing *Meshwerks*, his statement (p. 42) "nor do the Photographs evince intent by Evox to exactly replicate any automotive designs" appears verbatim in paragraph 48 of his California Rent-A-Car report (including the capitalized "P").   However, that language directly addresses a defense raised only by California Rent-A-Car, not KAYAK.[8]

His conclusions (such as that "the Photographs are successful automotive photographs" (p. 31) or "of the highest professional caliber" (p. 43) are also not relevant to copyrightability and would be confusing to a jury.  The jury in this case will not be asked to decide if the photographs were "successful" or of "high caliber" but whether they are copyrightable.  His windy generalizations about the possible creative choices made by Evox are irrelevant because they do not correspond with any of the very specific alleged creative choices identified by Evox in it response to KAYAK's Interrogatory 2.

---

[7]On p. 38 § P, he does add one new sentence that  there are no props in the "Photographs" at issue in this case.  That one sentence does not appear in his California Rent-A-Car opinion.

[8]California Rent-A-Car argued that the Evox images there at issue were not copyrightable because the cars themselves were somehow subject to copyright protection (a legal position KAYAK rejects) and that Evox photos were only derivative works copied from the cars.  Although KAYAK does contend that the Evox photographs at issue in this case were derived from other *photographs* of cars, and show no original variation from such *photographs*, cars themselves are functional and not copyrightable. (Moskin Decl. ¶ 5.)

Likewise, he argues a purely legal point (p. 42) whether a specific case mentioned in Mr. Elsner's report is "relevant."  Mr. Elsner did not "argue" whether the case, *Meshwerks, Inc. v. Toyota Motor Sales U.S.A.,* 528 F.3d 1258 (10th Cir. 2008), was relevant, he simply noted that it was one of the precedents provided to him by counsel identifying standards of copyrightability to assist Mr. Elsner in evaluating whether he could find in the five photographs identified by Evox as containing original and non-functional expression were indeed original based on these standards and his knowledge of the industry.  Moreover, because Mr. Sedlik is not a lawyer, his views about the relevance or not of specific cases are not admissible expert testimony.  Equally irrelevant and inappropriate are his criticisms of Mr. Elsner (p. 30) for merely acknowledging the standard accepted by the 9th Circuit in applying the scenes a faire doctrine under which features that are widely used or standard in a given field cannot be protected under copyright for fear of conferring a monopoly on the claimed owner.  *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) ("These elements are so commonplace in glass-in-glass sculpture and so typical of jellyfish physiology that to recognize copyright protection in their combination effectively would give Satava a monopoly on lifelike glass-in-glass sculptures of single jellyfish with vertical tentacles.")  It is Mr. Sedlik who is mistaken on the law, whereas Mr. Elsner made no pretense to offering legal opinions.

Finally, Mr. Sedlik's report did not analyze or consider any of the myriad prior art photographs (SUF 67-68) that show (by Evox's own admission (SUF 158)), that the elements it identified in response to KAYAK's Interrogatory 2 are not original to Evox.

Allowing Mr. Sedlik to testify can only serve to confuse the jury.  Nor is his report on copyrightability admissible in opposing summary judgment.

### i.    Mr. Sedlik's Report Is Not Proper Rebuttal

Not only does Mr. Sedlik's report in no way aid in understanding the issues of copyrightability, but his opinions are not proper rebuttal to the Elsner report.  Mr. Elsner did not opine on copyrightability as such; he admits he is not a lawyer and that he simply accepted the summary of copyright principles provided by KAYAK's counsel.  Instead,

with those principles in mind he simply applied his knowledge of photography (and stock photography in particular) to assess whether he could identify anything original and non-functional in the specific photographs and the underlying photographic processes identified by Evox.  In so doing, he merely observed that certain such processes were not unique to Evox; that many of the tools used by Evox were standard in the industry, and that, given the widespread use of certain features employed in the Evox photographs in issue, he could not identify anything original and non-functional.  He also opines on the possible detrimental effects on the industry in allowing Evox to monopolize rights in its images.

In response, Mr. Sedlik does not identify any respect in which Mr. Elsner incorrectly assessed the specific Evox photographs and he does not even purport to have reviewed any of the thousands of nearly identical photographs available from other stock photo houses (and which predated Evox).  Hence, the Sedlik report is not proper rebuttal.

## III.   **CONCLUSION**

For the foregoing reasons, KAYAK respectfully requests that the Court grant the summary judgment dismissing the Complaint, as set forth in the accompanying Proposed Order.

DATED:  December 16, 2016        **FOLEY & LARDNER LLP**


By:  /s/ Jonathan E. Moskin
     Jonathan E. Moskin
     Jean-Paul Ciardullo

Attorneys for Defendant/Counterclaimant KAYAK, INC.

4839-3838-0604.1

PROOF OF SERVICE

I am employed in the County of Alameda, State of California.  I am over the age of 18 and not a party to this action; my current business address is 555 South Flower Street, Suite 3500, Los Angeles, CA 90071-2411.

On January 30, 2013, I served the foregoing document(s) described as: **KAYAK SOFTWARE CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF JEFFREY SEDLIK** on the interested parties in this action as follows:

[        ]

____   BY MAIL
  ____   I placed the envelope(s) with postage thereon fully prepaid in the United States mail, at Los Angeles, California.

  ____   I am readily familiar with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service; the firm deposits the collected correspondence with the United States Postal Service that same day, in the ordinary course of business, with postage thereon fully prepaid, at Los Angeles, California.  I placed the envelope(s) for collection and mailing on the above date following ordinary business practices.

____   BY E-MAIL
  ____   I served the foregoing document via e-mail to the addressees above at the e-mail addresses listed therein.

____   BY FACSIMILE
  ____   I transmitted the document(s) by facsimile transmission from a facsimile transmission machine, at Los Angeles, California, with the telephone number, 213.486.0065, to Click and Type Name whose facsimile transmission telephone number is Click and Type Number .

  ____   I am readily familiar with the firm's practice for delivery by facsimile transmission:  the firm transmits the document(s) from a facsimile transmission machine to the person to be served.  I placed the document(s) in the place designated by the firm, at Los Angeles, California, for facsimile transmission to Click and Type Name whose facsimile transmission telephone number is Click and Type Number  on the above date following ordinary business practices.  The document(s) was transmitted from a facsimile transmission machine with the telephone number of 213.486.0065.

The facsimile transmission was reported as complete without error by a transmission report, issued by the facsimile transmission machine upon which the transmission was made, immediately following the transmission.

  BY HAND DELIVERY.  I delivered the envelope(s) by hand to
____   addressee(s).

4839-3838-0604.1

____   BY EXPRESS MAIL (Via United States Postal Service)

——   I deposited the envelope(s) in a facility regularly maintained by the United States Postal Service for receipt of Express Mail, with Express postage fully prepaid.

——   I am readily familiar with the firm's practice for collection and processing of correspondence for Express Mail; the firm deposits the collected correspondence with a facility regularly maintained by the United States Postal Service for receipt of Express Mail that same day, in the ordinary course of business, with Express Mail postage thereon fully prepaid, at Los Angeles, California. I placed the envelope(s) for collection and Express Mailing on the above date following ordinary business practices.

____   BY EXPRESS SERVICE CARRIER (Via Overnight Courier Service)

——   I placed the envelope(s) in a box or other facility regularly maintained by Click and Type Name of Courier , or delivered the document(s) to a courier or driver authorized by the express service carrier to receive document(s), in an envelope(s) or package designated by the express service carrier, with delivery fees paid or provided for, at Los Angeles, California.

——   I am readily familiar with the firm's practice for collection and processing of correspondence for delivery by Click and Type Name of Courier :  collected packages are picked up by an express carrier representative on the same day, with the Airbill listing the account number for billing to sender, at Los Angeles, California, in the ordinary course of business. I placed the envelope(s) in an envelope or package designated by the express service carrier for collection and processing for express service delivery on the above date following ordinary business practices.

____   Executed on January 30, 2013, at Los Angeles, California.

——   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

——   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____

Click and Type Name

4839-3838-0604.1